UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | CIVIL ACTION NO. 1:18-cv-2383 |
| Plaintiff, | |
| v. | **Complaint for Injunctive Relief, Restitution, Civil Monetary Penalties, and Other Equitable Relief** |
| KEVIN SCOTT ANTONOVICH, | **Under the Commodity Exchange Act** |
| Defendant. | |

Plaintiff, Commodity Futures Trading Commission ("Commission" or "CFTC"), by its attorneys, alleges as follows:

## I.  SUMMARY

1.  From at least September 29, 2015, through at least August 17, 2016 ("Relevant Period"), Kevin Scott Antonovich ("Antonovich"), fraudulently solicited and received approximately $284,043 from at least 154 individuals ("pool participants"), who are not eligible contract participants ("ECPs") as defined by Section 1a(18) of the Commodity Exchange Act ("Act" or "CEA"), 17 U.S.C. § 1a(18) (2012).  Antonovich solicited and received these funds in connection with pooled investments (hereinafter, the "group account") in off-exchange commodity options, namely binary options ("binary options" or "options").  In doing so, Antonovich misappropriated approximately $124,043 of pool participant funds for business expenses and his personal use, made false and misleading representations to pool participants,

1

and fabricated documents purporting to show funds available for return to pool participants. Furthermore, at no time during the Relevant Period was Antonovich registered with the CFTC as a commodity pool operator ("CPO").

2. By virtue of this conduct, and the further conduct described herein, Antonovich has violated the following provisions of the Commodity Exchange Act ("Act" or "CEA") and the Commission Regulations ("Regulations") promulgated thereunder: Sections 4*o*(1)(A) and (B), 4c(b), and 4m(1) of the Act, 7 U.S.C. §§ 6*o*(1)(A) and (B), 6c(b), and 6m(1) (2012); and Regulations 32.4(a)-(c) and 4.20(c), 17 C.F.R.§§ 32.4(a)-(c) and 4.20(c) (2017).

3. Unless restrained or enjoined by this Court, Antonovich will likely continue to engage in the acts and practices alleged in this Complaint, or in similar acts or practices, as described more fully below.

4. Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), the CFTC brings this action to enjoin Antonovich's unlawful acts and practices, to compel his compliance with the Act and Regulations, and to enjoin him from engaging in any commodity options related activities. In addition, the CFTC seeks civil monetary penalties, restitution, and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, pre- and post-judgment interest, and such other and further relief as the Court may deem necessary and appropriate.

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012) (federal question jurisdiction) and 28 U.S.C. § 1345 (2012) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). Section 6c(a) of the Act, 7 U.S.C. § 13a-l(a) (2012),

authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.

6. Venue properly lies with this Court pursuant to Section 6c of the Act because Antonovich is found in, inhabits, or transacts business in this District, or the acts and practices in violation of the Act and Regulations occurred, or are occurring, or are about to occur within this District, among other places.

### III. THE PARTIES

7. Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with responsibility for administering and enforcing the provisions of the Act and the Regulations promulgated thereunder.

8. Defendant **Kevin Scott Antonovich** currently resides in Woodside, New York. During a portion of the Relevant Period, Antonovich resided in Ashville, North Carolina. Antonovich has never been registered with the CFTC.

### IV. FACTS

**A.   Origin and Structure of the Group Account**

9. In approximately mid-2015, Antonovich and a number of associates he met through internet trading chatrooms formed Bull and Bear IT Traders ("BBITT") as an online business. The original purpose of BBITT was to provide trading signals and advice.

10. In or about August 2015, several people approached Antonovich and asked him to trade on their behalf in what Antonovich called a "group account." Antonovich solicited participation in the group account via a Facebook group used by BBITT customers.

11. In a September 29, 2015 Facebook group message, Antonovich explained the group account as follows: "If you invest $100, it will go into a trading account with everyones [sic] money and be traded until December 1st. I will be dividing all profits between everyone and sending out by December 15th."

12. In soliciting participation in the group account, Antonovich offered "a 100% money back guarantee." Antonovich told potential participants: "I take all the risk. The worst thing that can happen is you just get your money back. The goal is a 2-3% account increase or more per day, but I will be taking my time, not rushing anything." Antonovich noted that "[i]f everyone who has approached me gets in, we will be well over $10,000 to start our first journey together. That is amazing! Don't lose out, we can do this together."

13. Antonovich subsequently admitted that his trading history prior to these solicitations did not include account increases of 2-3% or more per day.

14. Each person who joined the group account – that is, each pool participant – received an investment contract wherein Antonovich agreed "to take all responsibility in trading" the pool participant's funds with a promise of returning at least the pool participant's "initial investment." The initial investment contracts reflected pool participants' initial placement of funds in the group account. Further, during the Relevant Period, investment contracts beyond those showing only the initial deposit by a pool participant did not accurately reflect the status of each pool participant's share of the group account.

15. Trading in the group account took place in multiple rounds during the Relevant Period. The initial round began October 1, 2015 and ran through December 1, 2015. Trading in the second and third rounds took place from November 30, 2015 to February 26, 2016, and from March 16, 2016 to June 17, 2016, respectively. The fourth round of trading was to occur from

4

July 1, 2016 to September 30, 2016. Antonovich issued new investment contracts to pool participants in each round, including those who participated in multiple rounds.

16. During the Relevant Period, the majority of pool participants placed between $100 and $500 with Antonovich while others placed larger sums. The two largest placements by individual pool participants were $25,000 and $28,000. Upon information and belief, the pool participants were not ECPs in that the aggregate amount that each individual invested on a discretionary basis was less than $10 million and no participant participated in the pool in order to manage the risk associated with an asset owned or liability incurred, or likely to be owned or incurred, by the individual.

17. Initially, Antonovich accepted pool participants' funds into his personal bank account via Venmo, Paypal, and a GoFundMe page set up on behalf of his mother. In December 2015, Antonovich opened a bank account in the name of BBITT Services LLC ("BBITT Services") and began depositing pool participant funds into that account and transferring the funds from there to offshore binary option trading accounts held in Antonovich's name.

18. During the Relevant Period, Antonovich communicated with pool participants via electronic mail and various Facebook groups, among other means.

**B.     Antonovich Misrepresented Where He Traded Pool Participant Funds**

19. Antonovich told pool participants he would be trading binary options on currencies on the Cantor Exchange, a CFTC-approved designated contract market. In fact, none of the trading Antonovich did on behalf of the pool participants took place on the Cantor Exchange. Rather, Antonovich transferred pool participant funds to three different offshore binary option trading accounts at various unregistered trading platforms. None of these off-shore

entities was registered with the CFTC as a designated contract market, as provided for in Section 5(a) of the Act, 7 U.S.C. 7(a) (2012), and Part 38 of the Regulations, 17 C.F.R. pt. 38 (2017).

C.     **Antonovich Misrepresented the Performance of the Group Account**

20.    During the Relevant Period, Antonovich issued numerous updates claiming that trading in the group account was profitable. All of these statements were false.

21.    For example, on February 29, 2016, Antonovich informed pool participants via electronic mail that the second round of trading was complete. Antonovich told pool participants: "I was unable to grow as much as I wanted, but I did grow the account 65%. **Starting balance $132,000, ending balance $217,800**" (emphasis in original). Antonovich also offered pool participants the opportunity to "rollover" their accounts into a third round of trading and invited them to recruit new participants. Antonovich advised pool participants that "if you recommend someone, you will receive **10% of their initial investment added to your total payout.** This is a nice win win for everyone" (emphasis in original).

22.    Antonovich's February 29, 2016 statements about the balance of the group account and its profitability during the second round of trading were false. In reality, trading in the group account was not profitable during the second round of trading.

23.    In response to Antonovich's February 29, 2016 false statements and solicitation, some round two pool participants placed additional funds with Antonovich for trading in round three.

24.    In an April 16, 2016 posting to the "BBITT Group Account" Facebook page, Antonovich extended the deadline to participate in the third round of trading and told pool participants that the group account was "up 11.5%." Antonovich subsequently admitted that this statement regarding performance of the group account was false.

25. In a May 21, 2016 electronic mail message, Antonovich told pool participants that "we are up 21% with the current group account." Antonovich noted that the group account "hasn't grown as much as I wanted, but I think because the account level is too high and the max I can trade is $1,000." Antonovich subsequently admitted that his statements that the current group account was "up 21%" and that the maximum amount he could trade was $1,000 were both false.

26. In a June 3, 2016 update to pool participants in the third round, Antonovich reported that the group account was "up a total of 28%." Antonovich subsequently admitted that this statement was false.

27. In a June 18, 2016 post to the "BBITT Group Account" Facebook page, Antonovich informed pool participants that the group account "ended 32% up" at the conclusion of the third round of trading. Antonovich subsequently admitted that this statement was false.

D. **When Pool Participants Sought Payouts, Antonovich Made Further Misrepresentations to Cover Up His Trading Losses**

28. For those pool participants who did not wish to participate in the fourth round of trading, Antonovich promised payouts at the end of June 2016. Rather than make the promised payouts and to cover up his trading losses, Antonovich made numerous misrepresentations about the availability of funds for payouts.

29. In a July 1, 2016 update, Antonovich claimed that a transfer of funds from the group account to facilitate payouts had been approved, but was delayed: "I'm still waiting for the withdraw transfer to hit my account. They approved it beginning of week, but I'm guessing since it is the biggest withdraw they are taking their sweet time. As soon as it hits, I will be sending funds." These statements were false. Antonovich subsequently admitted that, in reality, by July 1, 2016, nothing remained of the pool participants' funds in the group account.

7

30. In a July 7, 2016 update, Antonovich claimed that the pending funds transfer of "close to $200,000" had been flagged as suspicious and returned to the broker. Antonovich also told pool participants: "My lawyers are working on this, as fast as they can." Antonovich offered assurance to the pool participants: "All your money is still safe, there is no need to worry about that." Antonovich subsequently admitted that each of these statements was false.

31. In a July 27, 2016 electronic mail message and an August 1, 2016 posting to the "BBITT Group Account" Facebook page, Antonovich told pool participants that payouts would be forthcoming in the first week in August. Antonovich subsequently admitted that both of these statements were false.

32. In an August 4, 2016 update, Antonovich claimed that payouts were delayed due to an Internal Revenue Service ("IRS") investigation requiring him to consult with his attorneys and accountant. Antonovich told pool participants: "I cannot distribute any money until investigation is completed as my account is frozen." Antonovich subsequently admitted that these statements were false. Neither Antonovich, nor BBITT, nor BBITT Services was subject to an IRS investigation or audit. Antonovich did not retain lawyers or accountants in connection with the group account. And finally, the accounts he controlled were never frozen.

33. In the August 4, 2016 update, Antonovich also told pool participants: "Over the past year, I have paid out $75k to members of this group, making some money trading they never had before." Antonovich subsequently admitted that this statement was false.

34. On or about August 5, 2016, in a letter he signed at the request of two pool participants, Antonovich repeated the false statements concerning the purported IRS investigation/audit, the frozen BBITT accounts, and the imminent release of funds.

35. On August 8, 2016, Antonovich informed the pool participants that the "group account is officially over." Antonovich told the pool participants: "Those that were rolling over, your funds are still in the broker account. Once my account gets cleared and funds released, I will begin payouts to everyone who had first requested and then make the withdrawal from the broker and pay everyone else out." Antonovich subsequently admitted that these statements were false.

36. In an August 17, 2016 update, Antonovich told pool participants that "all funds should be released by October 1st at the latest." He referred to lawyers and the purported audit/investigation. Antonovich subsequently admitted that these statements were false.

**E.  Antonovich Fabricated Account Documents Purporting to Show Pool Participant Funds Were Available for Payouts and Distributed Investment Contracts that Did Not Accurately Reflect Participants' Shares in the Group Account**

37. Antonovich attached two documents to his August 17, 2016 update. Antonovich explained the attachments as follows: "I have attached what I am allowed, which is what is in the business account being held [sic] and the broker." The first attachment includes the Cantor Exchange logo and purports to show an account balance of $239,728.41. The second attachment purports to show a bank balance of $194,066.78. Antonovich subsequently admitted that he fabricated both attachments and that neither purported balance accurately reflects pool participant funds or funds available to pay pool participants.

38. Antonovich also admitted that he created both attachments to give pool participants the impression that funds were available to satisfy not only return of all principal funds, but also payment of all purported profits.

9

39. Antonovich also subsequently admitted that during the Relevant Period investment contracts beyond those showing only the initial deposit by a pool participant did not accurately reflect the status of each pool participant's share of the group account.

**F. Antonovich Misappropriated Pool Participant Funds for Business and Personal Expenses and Commingled Pool Participants Funds with Other Business and Personal Funds**

40. In total, during the Relevant Period, Antonovich fraudulently solicited and accepted approximately $284,043 from pool participants throughout the life of the group account. Of that amount, approximately $160,000 was deposited into three trading accounts and lost trading, while approximately $13,711 was returned to various pool participants.

41. Antonovich used the misappropriated funds to pay for business and personal expenses, and to make Ponzi-like payments in order to satisfy pool participant withdraw requests. Including the Ponzi-style payments, Antonovich misappropriated the remaining $124,043 of pool participant funds. He also commingled pool participants' funds with funds from BBITT's other businesses, as well as his personal funds.

## V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### Count One

### Violations of Section 4*o*(1)(A) and (B) of the Act
### Solicitation Fraud and Misappropriation by a CPO

42. Paragraphs 1-41 are realleged and incorporated herein by reference.

43. Section 4*o*(1)(A) and (B) of the Act,7 U.S.C. § 6*o*(1)(A), (B) (2012), make it unlawful for a commodity pool operator, or an associated person of a commodity pool operator by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly to: (A) employ any device, scheme, or artifice to defraud any client or participant or perspective

10

client or participant; or (B) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

44. Section 1a(11) of the Act, 7 U.S.C. § 1a(11) (2012), defines a CPO as "any person engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or other similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds . . . for the purpose of trading in commodity interests." Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017), in turn, defines commodity interest to include, among other things, options transactions subject to the Commission's jurisdiction.

45. As set forth above, Antonovich solicited, accepted, and received funds from multiple pool participants and pooled them together into the group account for the purpose of trading in commodity interests. Antonovich therefore acted as a CPO with respect to the group account.

46. As set forth above, Antonovich violated Section 4*o*(1)(A) and (B) of the Act by, among other things: (i) misappropriating pool participant funds to pay for, among other things, business and personal expenses, and to make Ponzi-style payments to pool participants; (ii) making material misrepresentations regarding the handling of participant funds invested with him, the performance of the group account, and the availability of funds to satisfy payout requests; and (iii) issuing false account documents to pool participants.

47. Antonovich's misappropriation, misrepresentations, and issuance of false account documents to pool participants were done knowingly or with a reckless disregard as to their truth or falsity.

48. Each act of misappropriation, fraudulent misrepresentation or omission made, and/or issuance of false account documents to pool participants, including, but not limited to,

those specifically alleged herein, is alleged as a separate and distinct violation of Section 4o(1)(A) and (B) of the Act.

## Count Two

### Violations of Section 4c(b) of the Act and Regulation 32.4(a)-(c)
### Options Fraud and Misappropriation

49. Paragraphs 1-48 are realleged and incorporated herein by reference.

50. Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012), makes it unlawful to "offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this Act which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guarantee', or 'decline guarantee', contrary to any rule, regulation or order of the Commission prohibiting any such transaction or allowing such transaction under such terms and conditions as the Commission may prescribe."

51. Regulation 32.4(a)-(c), 17 C.F.R. § 32.4(a)-(c) (2017), makes it unlawful for any person, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, directly or indirectly, to: (a) cheat or defraud or attempt to cheat or defraud any other person; (b) make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or (c) deceive or attempt to deceive any other person by any means whatsoever.

52. As set forth above, during the Relevant Period, Antonovich violated Section 4c(b) of the Act and Regulation 32.4(a)-(c) by, among other things: (i) misappropriating pool participant funds to pay for, among other things, business and personal expenses, and to make Ponzi-style payments to pool participants; (ii) making material misrepresentations regarding the handling of participant funds invested with him, the performance of the group account, and the

availability of funds to satisfy payout requests; and (iii) issuing, among other things, false account documents to pool participants.

53. Antonovich's misappropriation, misrepresentations, and issuance of false account documents to pool participants were done knowingly or with a reckless disregard as to their truth or falsity.

54. Each act of misappropriation and fraudulent misrepresentation, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 4c(b) of the Act and Regulation 32.4(a)-(c).

55. Each issuance of false account documents to pool participants, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 4c(b) of the Act and Regulation 32.4(b).

## Count Three

### Violation of Section 4m(1) of the Act
### Failure to Register as a CPO

56. Paragraphs 1-55 are realleged and incorporated herein by reference.

57. With certain specified exceptions and exemptions not applicable here, Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2012), makes it unlawful for any CPO to make use of the mails or any means or instrumentality of interstate commerce in connection with its business unless it is registered with the CFTC.

58. Section 1a(11) of the Act defines a CPO as "any person engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or other similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds . . . for the purpose of trading in commodity interests." Regulation 1.3(yy), 17 C.F.R. § 1.3(yy)

(2017), in turn, defines commodity interest to include options transactions subject to the Commission's jurisdiction.

59. As set forth above, Antonovich acted as a CPO during the Relevant Period in that he conducted a business that solicited, accepted, and received funds from multiple pool participants and then pooled those funds together in the group account for purposes of trading in commodity interests.

60. As set forth above, Antonovich used the mails or other means or instrumentalities of interstate commerce in connection with its business.

61. Antonovich violated Section 4m(1) of the Act by engaging in these activities without having registered as a CPO.

62. Each use by Antonovich of the mails or any means or instrumentality of interstate commerce in connection with their business as a CPO without proper registration, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 4m(1) of the Act.

**Count Four**

**Violations of Regulation 4.20(c)**
**Commingling**

63. Paragraphs 1-62 are realleged and incorporated herein by reference.

64. With certain specified exceptions and exemptions not applicable here, Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2017), requires that a CPO may not commingle the property of the pool with the property of any other person.

65. As set forth above, Antonovich violated Regulations 4.20(c), by commingling pool participant funds with non-pool participant funds.

66. Each instance of Antonovich commingling pool participant funds with non-pool participant funds, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Regulation 4.20(c).

## VI. PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers, enter:

a) An order finding that Antonovich violated Sections 4$o$(1)(A) and (B), 4c(b), and 4m(1) of the Act, 7 U.S.C. §§ 6$o$(1)(A), (B), 6c(b), 6m(1) (2012), as well as Regulations 32.4(a)-(c) and 4.20(c), 17 C.F.R. §§ 32.4(a)-(c), 4.20(c) (2017);

b) An order of permanent injunction prohibiting Antonovich and any other person or entity associated with him, from:

  1) in connection with the operation of a commodity pool, use of the mails or any means or instrumentality of interstate commerce, directly or indirectly: employing any device, scheme, or artifice to defraud any client or participant or perspective client or participant; or engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant, in violation of Section 4$o$(1)(A) and (B) of the Act;

  2) offering to enter into, entering into or confirming the execution of, any transaction involving any commodity regulated under this Act which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guarantee', or 'decline guarantee', contrary to any rule, regulation or order of the Commission prohibiting any such transaction or allowing such transaction under such terms and conditions as the Commission may prescribe, in violation of Section 4c(b) of the Act;

  3) in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, directly or indirectly: (a) cheating or defrauding or attempting to cheat or defraud any other person; (b) making or causing to be made to any other person any false report or statement thereof or causing to be entered for any person any false record thereof; or (c) deceiving or attempting to

15

                deceive any other person by any means whatsoever, in violation of Regulation 32.4(a)-(c);

4)     making use of the mails or any means or instrumentalities of interstate commerce while engaged in the business of a CPO, that is, a business that is of the nature of a commodity pool, investment trust, syndicate, or other similar form of enterprise, and, in connection therewith, soliciting, accepting, or receiving from others, funds for the purpose of trading in commodity interests, without having first registered with the CFTC as a CPO, in violation of Section 4m(1) of the Act;

5)     commingling the property of the commodity pool with the property of any other person, in violation of 17 C.F.R. §§ 4.20(c).

c)     An order of permanent injunction prohibiting Antonovich and any of his agents, servants, employees, assigns, attorneys, and persons in active concert or participation with him, including any successor thereof, from directly or indirectly:

1)     trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

2)     entering into any transaction involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)) for Antonovich's own personal or proprietary accounts or for any account in which Antonovich has a direct or indirect interest;

3)     having any commodity interest traded on Antonovich's behalf;

4)     controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5)     soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

6)     applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided in Regulation 4.41(a)(9), 17 C.F.R. § 4.41(a)(9) (2017);

7)     acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent, or other officer or employee of any person (as that terms is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)) registered, exempted from registration or required to be

      registered with the CFTC, except as provided in Regulation 4.41(a)(9); and

    8)  engaging in any business activities related to commodity interests;

  d)  An order directing Antonovich, as well as any successors thereof, to disgorge to any officer appointed or directed by the Court all benefits received, directly or indirectly, from acts or practices that constitute violations of the Act and the Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

  e)  An order directing Antonovich, as well as any successors thereof, to make full restitution to every person or entity whose funds Antonovich received from the acts or practices that constitute violations of the Act and the Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

  f)  An order directing Antonovich to pay a civil monetary penalty for each violation of the Act of not more than the amount set forth by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584 (2015), title VII, Section 701, and promulgated in Commission Regulation 143.8, 17 C.F.R. § 143.8, plus post-judgment interest;

  g)  An order requiring Antonovich to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

   h)  An order providing such other and relief as this Court may deem necessary and appropriate.

Dated: April 23, 2018

               Respectfully submitted,

               <u>/s/ Richard A. Glaser</u>
               Richard A. Glaser (EDNY Bar No. 8652)
               rglaser@cftc.gov
               James A. Garcia
               jgarcia@cftc.gov
               Alison Wilson
               awilson@cftc.gov
               Division of Enforcement
               Commodity Futures Trading Commission
               1155 21st Street, NW
               Washington, DC 20581
               Telephone: (202) 418-5362 (Garcia)
               Telephone: (202) 418-5568 (Wilson)
               Fax: (202) 418-5937

               Attorneys for Plaintiff